## THE WEST SIDE SAVINGS BANK, Respondent, *against* ISAAC NEWTON, Appellant.

### (Decided June 18th, 1877.)

Where at the time of a lease the demised premises are supplied with water conveyed there by pipes, *e. g.*, with the Croton water in the city of New York, the use of the water is a privilege or easement which constitutes a part of the demised premises, and if the landlord shut off the supply of water through the pipes and refuses to allow the tenant the use of it, this amounts to an eviction from a portion of the demised premises; and the tenant, on surrendering possession of the premises, is relieved from payment of the rent reserved in the lease, except for the period for which he has actually occupied the premises.*

Where the landlord turned off the Croton water from the demised premises in such a case, and forbade the tenant to turn it on again: *held*, that this amounted to an eviction from a portion of the demised premises.*

Where the secretary of a savings bank acted for the bank in leasing certain premises belonging to it, and received the rent, and the lessee was referred to him about matters connected with the lease, and the secretary, with the knowledge and approval of the president of the bank, turned off the Croton water from the demised premises, and refused the lessee the use of it: *held*, that such act was one by which the bank was bound.*

When Croton water pipes which are arranged for a whole building, and which supply water to the part occupied by the tenant of a portion thereof, get out of repair, the landlord of the whole building is the one to repair them, and not the tenant who occupies only a part thereof.*

APPEAL from a judgment of the Marine Court of the city of New York affirming a judgment entered on a decision of the Chief Justice of that court after a trial before him without a jury.

The facts are stated in the opinion of Judge ROBINSON.

*Ira Shafer*, for appellant.

*Benedict & Benedict*, for respondent.

* The head notes here given are in accordance with the final decision of the case in the Court of Appeals, where the decision of the General Term here was reversed, and the dissenting opinion of DALY, Ch. J. approved. See the foot note at end of the case.

CHARLES P. DALY, Chief Justice, dissenting.—The chief justice before whom the cause was tried has found that no such notice was given by Mrs. Carpenter to the plaintiff declaring the lease at an end as was required within the clause providing for the termination of it, upon giving ninety days' notice. Mrs. Carpenter swore that on or about the 5th day of March she gave Mr. Allee, the secretary of the company, the ninety days' notice under the lease; that she did so at the request of her surety, the defendant; that she told Allee, standing in the door of the bank, that she had come to avail herself of the clause in the lease of ninety days, as she could not keep the premises for want of the Croton water, and that she never told him afterwards that she did not intend what she said to him as a notice under the clause in the lease. This Allee denied. He fixed the time of the interview between them at about the 5th of April, when, he said, she came to pay the rent; that she then told him that unless the pipes were fixed she would have to give up the house; that it afterwards occurred to him that she may have meant to give a notice under the lease, and that the following day he met her in the hall and asked her if she intended what she said as a notice under the lease, and that she said she did not intend it so, but that she wanted the water pipes fixed. Here was a direct conflict upon the point, and we cannot say that the chief justice erred in a finding by which it is evident he believed that the secretary's statement was true.

The tenant was under no obligation to keep the water pipes in repair. She occupied only a part of the house, the plaintiff occupying the residue for their bank. The lease provided that she was not to be held liable for any repairs, except as therein provided, and the subsequent provision was that she should keep the gas pipes and fixtures in repairs, and do all inside repairs. The secretary, Allee, testified that the clause in the lease about the water pipes was stricken out at the defendant's (the surety's) request, which is corroborated by the inspection of the instrument attached to the complaint, by which it appears that the words " *water and* " were erased preceding the words " gas pipes," showing plain-

ly that the tenant was not to keep the water pipes in repair, but that that was to be done by the landlord.

If the plaintiff turned off the water because the pipes in the part of the premises occupied by the tenant leaked, and the water ran through the ceiling of the bank, it was wholly without excuse, as it was the duty of the plaintiff to keep those pipes in repair. I am also of opinion that if the plaintiff turned off the water so as to deprive the tenant of the use of it, it was such an interference with and a deprivation of the beneficial enjoyment of the premises as would justify the tenant in abandoning them, and release her from the payment of rent. (*Dyett* v. *Pendleton*, 8 Cow. 727; *Edgerton* v. *Page*, 1 Hilt. 320; *Cohen* v. *Dupont*, 1 Sandf. [S. C.] 260; *Jackson* v. *Eddy*, 12 Miss. 209.) Such an act of the lessor, *accompanied by an abandonment of possession* by the lessee, is deemed a virtual expulsion of the tenant and bars the recovery of the rent. (Per Grover, J. M., *Edgerton* v. *Page*, 20 N. Y. 284.)

Mrs. Carpenter, however, did not abandon the premises, according to her own testimony, until the 4th of September, and was therefore liable for the rent for the month of August; for a tenant cannot remain in possession of the premises, whatever may be the interference with, or disturbance of, the beneficial enjoyment, and claim to have been evicted and discharged, (whilst thus retaining possession,) from the payment of rent. (*Mortimer* v. *Brunner*, 6 Bosw. 659; *Edgerton* v. *Page*, 1 Hilt. 320; *Harrison's Case*, Clay R. 34; *Campbell* v. *Shields*, 11 How. Pr. 565; *Wilson* v. *Smith*, 5 Yerger, 399.) For the interference with her possession during that time her remedy was an action for damages.

It remains then to consider whether it is shown by the evidence that there was such an interference by the plaintiff with the use and enjoyment of the portion of the house which she occupied as justified her in leaving when she did, and discharged her from the payment of rent for the months of September and October; the residue of the period for which rent was recovered.

The objection that no such defense is set up by the an-

swer is untenable.   The answer avers that in January, 1870, the plaintiff shut off the Croton water from the premises leased by Mrs. Carpenter, and prevented the flow thereof to any portion of the same, and continuously deprived her of the use of said Croton water during all the time that she remained in possession of the premises; and that by reason of the plaintiff's wrongful behavior, the defendant was released and discharged from any liability as surety for the payment of the rent, which was a sufficient averment of the defense.

The chief justice found that the plaintiff did not turn off the Croton water from the premises during the occupancy of them by Mrs. Carpenter, and that she was evicted from no part of said premises by any act, or direction, or authority of the plaintiff.   I think this finding was erroneous; that the evidence shows that throughout her occupation the plaintiff, through its officers, the president and the secretary, claimed the right to keep the water turned off unless she would repair the pipes, and that it was kept turned off by them, or by their direction, so as to prevent any injury by the leaking of the water to the ceiling of the bank; that she made frequent complaints to the officers, without redress; that she was subjected to great annoyance and inconvenience by the deprivation of the water; and that she left the premises for this reason, after unavailing remonstrances on her part: making a case quite as strong as *Cohen* v. *Dupont* (1 Sandf. [S. C.] 260), where it was held that a series of petty annoyances on the part of the landlord which interfered with the tenant's beneficial use of the premises, and was injurious to his business, amounted to an eviction, where the tenant abandoned the premises in consequence.   In that case, one of the chief annoyances was the muffling of the street bell of the defendant, who was a dentist, by which his customers were kept pulling the bell and waiting from fifteen minutes to half an hour before effecting an entrance, and were sometimes compelled to leave without effecting an entrance into the house; the other annoyances consisting in littering the approach to his apartments with sweepings of the story above, and other petty acts of this nature.

It is claimed on the argument that whatever the secretary may have done in respect to turning off the water, or keeping it turned off, or whatever he may have said as to the necessity of doing so, he acted solely upon his own responsibility, and not in accordance with any authority from the plaintiff, that matter being exclusively under the control of the president. This conclusion is not warranted by the evidence. There were only three persons who attended to the business of the bank, which was a savings bank, as officers or employees, namely, the president, the secretary, and a clerk, who could have been in any way connected with the turning off of the water or keeping it turned off, unless it might be the board of directors or trustees, of whom nothing appears in the evidence except that there was such a body.

The secretary, apart from his official position as such an officer in such an institution, was the one who conducted all the negotiations respecting the lease and the special provisions or clauses that were inserted in it. He swore expressly that all the negotiations about the lease were transacted by him ; that he was fully authorized to act for the bank, except as he was instructed by the president to refer Mrs. Carpenter to him. He swore to this on the former trial, and the testimony to this effect, which he then gave, was read on this trial without objection. He first made the draft of the lease proposed to be given by the bank. The objections to certain clauses in it and the desire to have other clauses inserted were made to him ; and after consulting with the president, he brought the lease with these alterations in it executed by the bank. The tenant and surety signed and acknowledged it in his presence, and he subscribed his name to it as a witness.

Mrs. Carpenter testified that the president gave her to understand that she was to transact her business with the bank through the secretary, and stated that what business she had with the bank as tenant she transacted with that officer.

The president, without directly denying that statement, qualified it by saying that he referred to her taking care of

the premises, her compensation for that service, and to her paying her rent to the secretary. The president knew very little about the lease ; he did not recollect to have seen it until it was produced at the former trial. He did not pay much attention to the parts proposed to be stricken out, and did not even know that there was a proviso in it by which she could terminate the lease upon her notice of ninety days until his attention was called to it, long after the lease was executed, showing that the whole matter was left, to a great extent, in the hands of the secretary. But this point is not very material, as it clearly appears from the evidence that whatever the secretary said or did in respect to keeping the water turned off he did with the approval of the president. The president, the secretary, and the clerk all swore that they did not turn off the water, order it to be turned off, or know that any person connected with the bank turned it off; but notwithstanding this denial, it appears very clearly, both from the testimony of Mrs. Carpenter and the president and the secretary, exactly what took place.

Mrs. Carpenter came in first as a sub-tenant of one Cohen, and upon Cohen's leaving, she leased the whole of the premises which he occupied, which included the basement, where the stop-cock was placed, and to which, during her occupancy, the bank had access, and used in part for storage and for keeping its coal. She leased the premises, as above stated, on the 1st of October, 1869, when the water flowed to the third story, and where she had the use of it, having twelve girls employed in that story on sewing-machines. About four or five weeks after her occupation commenced, or about the middle of November, 1869, as appears from her own testimony and that of several of her employees, the water was stopped off, subjecting her and them to great inconvenience and trouble from the deprivation and the want of it in that part of the building, as all water, after this, had to be carried up from the basement ; and this state of things continued during the whole of her occupation, which ended on the 4th of September, 1870. She testified that the water did not again run whilst she was on the

premises, except once. The day after it was stopped she went to see the secretary about the water not running; told him that it was stopped, and that she wanted the water up stairs. He went with her to the basement, said he could turn on the water so that it would flow up stairs, and did so; and finding such to be the fact she expressed her gratification, upon which he turned it off, telling her he could not allow it to run, as the pipes were out of order. She asked him afterwards if she could not have the water turned on; that she had it when she rented the premises, and thought it was her right to have it continued. She also testified that she spoke to the president about it, and that he promised to remedy it, but told her she must pay for the repair of the pipes, which she refused to do, saying that she had a right to the water and expected him to give it to her; and he said he would speak to the board about it.

The president denied on the trial that he had any communication personally with her on the subject, but heard of her complaint only through the secretary, and may have forgotten the fact, as she testified that when she saw him, shortly before she left the premises, he seemed to have forgotten that she had spoken to him previously about it.

It appeared from her testimony that she sub-let a portion of the premises, and had great trouble with her tenants, who said they would not stay, because they found there would be no water, together with the inconvenience to which she and her employees were subjected. In March, 1870, she told the secretary she could not keep the premises for the want of water; that unless she could have it, she would have to give up the house; and he told her that he would speak to the president; and before she left again told the secretary she could keep the house no longer, as they had deprived her of the water; that if the bank did not repair the pipes, and let her have the water up stairs, she would pay no more rent, as she could receive none from her tenants without the water. Just before she left, the president asked her why she wished to leave, and she said she could not get respectable tenants to stay without the water. He then said he did

not think she could do better, and she told him it was impossible for her to remain, as the house was in such shocking repair. He told her he would hold the surety for the rent. The day that she departed plumbers were sent in, and the water pipes were repaired by the plaintiffs.

This state of things is not denied, but corroborated, by the plaintiffs' testimony, and especially by that of the secretary. He testified he told Cohen, while he was in occupation of the premises, as the water leaked through the ceiling of the bank, which would probably fall down, that the water must be stopped, as the bank would not have the water run in that way. He also admitted that he told Mrs. Carpenter that he could not leave it turned on because the pipes were out of repair, and the water would leak through the ceiling. That the water could not be turned on up stairs; that they could not have the water up stairs whilst the pipes leaked, to the injury of the ceiling of the bank; that they could not turn the water on until the pipes were fixed; that he would speak to the president; that he did so, and the president said she made a great many complaints about everything; to do nothing about it, but to leave it altogether to him.

He corroborated her statement fully as to what occurred between them at the basement in the interview before mentioned; that he turned the water on, and said he would show her how the water could be made to flow up stairs; that she said she was much obliged to him, and hoped he would leave it turned on; that he told her no, that he could not leave it turned on until the pipes were fixed, and that she would have to fix the pipes. The president was thus fully informed of her complaint. He was asked if he did not have complete control of the water. His reply was, "Not technically." He was then asked, "Did you have, or take control of the water?" He answered, "No." He was then asked if he did not so testify on a former trial, and said he did not recollect. He was then told that it so appeared in the testimony taken at that trial, and he answered, "It may be so." He was then shown a copy of his testimony at that trial, and said, "I find I so testified, if this is a correct

account." He was then asked whether he did so testify or not, and he answered, "I presume I did;" and then admitted that he testified at the former trial that *the water was under his control;* that he could have ordered it turned on, but did not, because, before Cohen left, the water from the second story ran into the bank, and that that was the reason why he did not order it turned on ; that he had knowledge, a few weeks after Mrs. Carpenter took possession, of her complaint that the water was not running on ; that he told the secretary to refer Mrs. Carpenter to him ; but it does not appear by the testimony that the secretary referred her to the president, but all that appears is that he told her that he would see the president about it.

There can be no doubt, from this testimony, that the water was kept turned off during Mrs. Carpenter's occupancy by the president and the secretary ; that the president assumed to have control of the matter, and that it was with his and the secretary's knowledge and concurrence that she was deprived of the use of the water ; that they did so to protect the ceiling of the bank from injury, and kept it turned off unless she would have the pipes repaired ; being both under the erroneous impression that the obligation was upon her to keep the pipes in repair, and not upon the bank, and that it was not until they saw that she was going to leave that they sent workmen in and had the pipes repaired. Conkling, the president, said on the former trial, " I remember that there were a great many complaints and demands for improvements of various kinds ; absence of water was among them. I said to Mr. Allee (the secretary), in substance, to let Mrs. Carpenter come to me. I conveyed the impression to him to do nothing about it, but to leave it to my control. That was my answer from first to last, during Mrs. Carpenter's occupation of the premises ; the control of the premises was in my hands ; the water was under my control ; I could have ordered it turned on ; I did not, because, before Cohen left, the water from the second story ran through the ceiling into the bank ; that he, Cohen, immediately turned it off for his own protection, because he was told that if any damage was

sustained by the bank he would have to make it good, and it was never turned on again.

This testimony requires no comment. It shows very clearly that it was by the act of the landlord that Mrs. Carpenter was deprived of the water, and it was such an interference with, and disturbance of, her possession and enjoyment of the premises as warranted her in leaving them, and discharged her and her surety from a portion of the rent that was recovered.

These acts on the part of the secretary and the president in the disturbance of the tenant's beneficial use and enjoyment of the premises were acts done within the scope of their employment or official position, as officers or agents of the corporation, for which the corporation was responsible, so far as they amounted to an eviction of the tenant, and the discharge of her and her surety from any liability for the payment of rent by reason of the eviction. (Angel & Ames on Corp. § 310, 9th ed.; 2 Hilliard on Torts, 322, 3d ed.; Brice on Ultra Vires, p. 225; *Ranger* v. *Gr. W. R. R. Co.*, 5 H. Lds. 72; *Weed* v. *Panama R. R. Co.*, 17 N. Y. 362; *Blackstock* v. *N. Y. & Erie R. R. Co.*, 20 Id. 48.)

We cannot, with propriety, reduce the amount, and affirm the judgment for the residue, for there is a difference in the testimony of Mrs. Carpenter and that of the secretary as to the time when she left; she stating that she left on the 4th of September, and the secretary testifying, to the best of his recollection, that it was on the 23d of that month. The better course, therefore, is to reverse the judgment generally, leaving the plaintiffs to sue again for the rent during the time of her actual occupation.

ROBINSON, J.—The defendant was sued as surety upon a lease executed by plaintiff to a Mrs. Carpenter of "all the house, No. 154 Sixth Avenue, except the portion occupied by the bank, for the term of one year and seven months from October 1st, 1869, at a yearly rent of eight hundred dollars, payable monthly in advance." The rent claimed is for the months of July, August, September and October, 1870. By

the terms of the lease the lessee agreed " to keep the gas-pipes and fixtures of the house and premises in good repair and condition, and to do all inside repairs to said house at her own proper cost and expense." In the printed lease presented for execution, by consent of parties the specific agreement to pay the Croton water-tax by the lessee, as also to keep the " water-pipes " in repair, was stricken out before execution. Whatever may have been the views of the parties as to the obligations the parts stricken out may have imposed, the lease is obligatory as to the actual terms employed when executed.

The answer in substance asserts that, by reason of this alteration in the printed form, the plaintiff in legal effect agreed to keep the water-pipes in repair, and verbally agreed to do so. This assumption cannot be maintained. The contract must be construed in legal effect as it reads, and cannot be varied for incompleteness, except upon some affirmative action by a complaining party of fraud or mistake in its preparation, and for its correction in the particulars wherein it is erroneous. The lease is to be read according to its terms, and legal effect given to every part of it.

By the letting the tenant became owner of the premises for the term of the demise, subject only to having her estate defeated for breach of the conditions of the lease. She thus becomes a purchaser of the premises for such term in the condition in which they were when leased. She took his purchase " for better or for worse," as the law imposed upon her the condition of keeping them in the same state and condition (ordinary wear and natural decay only excepted), so that she might so restore them at the end of her term (Taylor, Land. & Ten. § 343). No duty could be exacted from her landlord in respect to repairs unless the landlord made some agreement to that end, and the omission of the landlord to perform such an agreement is no defense against the claim for rent, except by way of recoupment. No defense in this respect is interposed in this case. Those urged on the trial were:—

*First.* An eviction of the tenant by the landlord's depriv-

ing her of the use and benefit of the Croton water in the second and third stories; and

*Second.* A determination of the lease by the giving ·of a prior notice of the tenant's intention, as provided in the lease, and which it is alleged was given March 5th; 1870, so as to constitute as (claimed) a defense against the four months' rent sued for, accruing on and after July 1st, 1870.

Considering first the second defense, the evidence to support it was the testimony of Mrs. Carpenter that she gave notice on the 5th day of March, 1870, to Mr. Allee (plaintiff), the cashier, to whom she paid her rent. She testifies: " I gave notice to Mr. Allee under the ninety days' clause in the lease on or about the 5th of March, 1870. I told him I could not keep the premises because of the want of the Croton water."

Mr. Allee contradicts her, and states she never gave him any notice of that character; that the only statement made by her from which it might be inferred was made on the 5th of April, 1870, when she said "she would have to have the water up stairs, or she would give up the premises." His· attention being called to the provisions of the lease, he saw her on the next day, and mentioning her allusion on the day previous *to her leaving the place,* asked her if she intended that as a notice under the ninety-day clause of the lease, and she replied " she did not." This testimony (aside from other considerations as to the legal efficacy of any such notice, as she testifies to it) fully warranted the ninth finding of the judge who tried the cause (without a jury), that no such ninety-day notice as was provided for in the lease had ever been given.

The first defense of eviction of the tenant is not unsustained by the judge in his fifth finding of facts, and his decision is fully sustained by the ·proofs. The stop-cock, which controlled and regulated the flow of the Croton water to the second and third stories, was in the basement leased to and occupied by the tenant, Mrs. Carpenter. There is nothing in the evidence even tending to show that plaintiffs even trespassed upon her premises, or violently or by unlawful

menace interfered or prevented her using that stop-cock, or turning on the flow of water to the second and third stories. She was in their employment, and took charge of their banking-room to keep it in good order and condition. The whole difficulty arose from a defect in the waste-pipe in the second story, which carried off the waste water from the sink above, and through which the dirty water leaked on to the ceiling of the bank room, which shortly afterwards (in August, 1870) from that cause became detached, and fell. The plaintiffs remonstrated with Mrs. Carpenter against her allowing the water to be so used to their injury. On one occasion, Mr. Allee, their cashier, went down into the cellar, and showed how to turn on the water to the upper stories. On turning it off, Mrs. Carpenter says he said, "she could have no more water up stairs until the pipes were fixed;" while he testifies he said, " I told her I could not leave it turned on, because the pipes were out of repair, and the water would leak through the ceiling." The trivial difficulty between the plaintiff and their tenant was as to who should pay the expense of the repairs to the water-pipes, which the tenant declined to do.

The matters before stated substantially constitute the evidence as to the eviction. While the tenant, under the circumstances, may not have been under any affirmative obligation to repair the water-pipes (which may well be questioned under her agreement " to do all inside repairs to said *house* at her own proper cost and expense "), yet this defect in the waste-pipes existed when she leased the premises, and she had no legal claim on plaintiffs to repair them. She was under a general obligation of law bound to make no such use of them as injured others. Hiring the premises with such defective waste-pipes, she was guilty of a wrong in making any such use of them as immediately resulted in an injury of the plaintiffs. No act done by the plaintiffs, or any of their officers, can be otherwise construed than as a remonstrance or dissent against Mrs. Carpenter's allowing the water from her premises to flow down and injure the ceiling. They never attempted any trespass upon the premises leased

to her, nor ever ventured thereon and assumed the right to interfere with and cut off the upward flow of the water to the second and third stories. They, at the utmost, did what they had a right to do—to use such language as expressed in positive terms their dissent and remonstrance against her use of the defective water-pipes on *her* premises while such use immediately resulted in injury to the ceiling of their banking-room.

It needs no citation of authorities that to this extent plaintiffs were fully justified in dealing with their tenant as a stranger in interest. And as the case presents no feature of any trespass by them upon her premises or appurtenances, and far less that they have been guilty of any eviction of their tenant, the judgment should be affirmed.

LARREMORE, J., concurred with Judge Robinson.

CHARLES P. DALY, Chief Justice.—The striking out of the provision in the lease in relation to Croton water repairs is, as between the parties, to be taken as an indication that she was not to keep the water-pipes in repair, and the omission of anything in the lease respecting repairs subjects the tenant only to the necessity of keeping the premises in the condition in which they are in, and the tenant is bound to make "fair and tenantable" repair, but not permanent repairs. If the Croton water-pipes, which are arranged for the whole building, and which supply water to the part occupied by the tenant, get out of repair the landlord of the whole building is the one to repair them, and not a tenant who merely occupies a particular part of the building, for a tenant is not bound to make permanent repairs, or repairs that relate to the whole structure, when he merely occupies a part of it. Mrs. Carpenter was willing to take the premises as they were; but it was the plaintiffs who would not let her, and kept the water shut off from her part of the house, which was that unwarrantable interference with the beneficial enjoyment of the tenant that the law condemns on the part of the landlord towards his tenant, whom he should on the

contrary protect and defend (Taylor, Landlord and Tenant, § 378, 5th ed.); and I think the evidence shows that the officers of the bank in this case claimed and exercised the power of keeping the water turned off. She was told that it could not be turned on unless she repaired the pipes, and it is evident that she was deterred by the officers telling her that it could not be turned on, their acts and declarations showing that they claimed the right to control it, in which she finally acquiesced and left the premises.

Judgment affirmed.*

---

* On appeal to the Court of Appeals, the judgment entered on the decision of the general term here was reversed, the following opinion being handed down on March 18th, 1879 :—

Per CURIAM.—We are of opinion that the finding that the plaintiff was not bound by the acts of the cashier was erroneous. The act of showing Mrs. Carpenter how to turn the water on is not material, but the turning it off, accompanied by the positive injunction that it must not be turned on, constituted an act which, in effect, deprived the lessee of the use of the water for the upper stories of the demised premises. The cashier had done all the business in respect to the leasing of the premises ; he procured the execution of the lease, and received the rent ; the lessee was referred to him about matters connected with the lease ; he assumed to speak authoritatively, and the evidence shows that the lessor, both through its secretary and president, refused, and intended to refuse, the use of the water in the pipes as then existing. If this finding had been otherwise, the trial judge might have arrived at a different result.

Upon the merits we are inclined to concur with the opinion of Chief Justice Daly. The use of the water was a privilege or easement which constituted a part of the demised premises ; and under the lease as executed, and the circumstances of the case, we think that it was the duty of the plaintiff to put and keep the pipes in repair, especially that part of them immediately connected with the room reserved from the lease, and used by the plaintiff. Having deprived the lessee of the use of the water for nearly all the demised premises, it is not just that the lessee or surety should pay rent beyond the time when the lessee actually occupied the premises. Adopting the reasons of Chief Justice Daly for these conclusions, we refrain from repeating them.

The judgment of the Common Pleas and Marine Court must be reversed.

All concur.